SEABROOK *v.* FOWLER.

The legislative act of June 26, 1822, confirming and establishing the westerly boundary line of Seabrook, and enacting that " all the lands, non-resident as well as resident, and the waters lying easterly thereof to the sea, shall belong to the town of Seabrook for the purpose of taxation and jurisdiction, and to all other legal and constitutional interests and purposes whatever," did not transfer to the town the legal title to such lands and water.

TRESPASS, to a piece of sandy beach in Seabrook, bounded southerly by the state line, easterly by the Atlantic ocean, northerly by Hampton river, and westerly by marshes bordering on the Blackwater river. Facts found by the court. The following is a synopsis of the plaintiffs' title:

1. The charter of the Council of Plymouth, dated November 3, 1620. For an abridgment of this charter, see Prov. Papers of N. H., *vol.* 1, *p.* 4.

2. The grant of the Council of Plymouth to the Massachusetts Bay Colony, dated March 19, 1627-8, a portion of which may be found in Prov. Papers, *vol.* 1, *p.* 18.

3. Charter of Salisbury, granted by the Massachusetts Bay Colony.

4. The grant of the Council of Plymouth to Captain John Mason, dated November 7, 1629.   Prov. Papers, *vol.* 1, *p*, 21.

5. Deed, John Tufton Mason to William Dudley and others, as agents for and in behalf of the province of Massachusetts Bay in New England, dated July 1, 1738.   This deed rehearses the foregoing deeds and the conflict in them, and states in substance that the governor and company of the colony of Massachusetts Bay, prior to the purchase of Captain John Mason, through mistake of their grant, "apprehending their northern boundary was a due west line from the Atlantic to the South Sea, running three miles to the northward of any and every part of Merrimack River," enclosed within the bounds of Salisbury and other towns granted by them, lands lying more than three miles northward of the Merrimack river, and that the king in council, on July 26, 1677, decided that the northerly boundary line of the Massachusetts Bay should follow the course of the river, and that the proprietors and inhabitants of Salisbury and other towns above referred to have continually possessed and enjoyed the lands so included within their boundaries.   The deed ratifies and confirms the boundary line as established by the king, and remises, releases, and quitclaims " to the inhabitants and proprietors of the several towns of Salisbury," etc., all those several parcels of land lying within the bounds of their respective towns and more than three miles to the northward of Merrimack river, " in their actual possession now being."

6. The parties agreed that John Tufton Mason was sole heir at law of the devisee of Captain John Mason, at the date of this deed.   The commoners or proprietors of the common lands of Salisbury were in possession of the beach in controversy in this action at the time (1741) the king established the boundary between this state and Massachusetts, and for many years prior thereto.

7. By the king's decision and Mitchell's line (attempted to be run in pursuance thereof) a portion of Salisbury, including the beach in controversy, was transferred from Massachusetts to New Hampshire, and has ever since been regarded a part of this state.   The parties agreed that Mitchell's line was substantially the same as the present boundary line between the states.

8. May 25, 1742, the inhabitants residing within the territory bounded southerly by Mitchell's line, easterly by the ocean, northerly by Hampton Falls, Kensington, and Kingston, and westerly by a described line, with certain exceptions, were incorporated by Gov. Benning Wentworth, to be a town or parish by the name of South Hampton, " to have and to hold all the privileges and immunities of a town corporate, and to be ruled and governed in all respects for the said town affairs by the laws of this province of New Hampshire, as other towns are."

9. The plaintiffs claim that South Hampton acquired title to this beach by adverse possession after the state line was settled by the king's decision. If this question becomes material, it is reserved for decision hereafter. Dec. 4, 1742, what is now Seabrook was declared to belong to the parish of Hampton Falls. See 52 N. H. 226, 230.

10. June 2, 1768, all the polls and estates within certain boundaries in the southerly part of Hampton Falls were incorporated, by the general council and assembly of the province of New Hampshire, into a parish by the name of Seabrook, and invested with all the legal powers and authorities, and enfranchised with the same rights, liberties, and privileges, that any other parish in the province enjoyed, and were exonerated and discharged from any duty, taxes, and services which they were theretofore bound to do and perform at Hampton Falls, with certain exceptions, and were excluded from joining with Hampton Falls in voting about and concerning parochial or town affairs. Parties agreed that the boundaries of this parish did not include the beach in controversy.

11. By an act of the legislature of New Hampshire, approved June 26, 1822 (made a part of the case), the westerly boundary line of Seabrook was confirmed and established; and it was enacted that " all the lands, non-resident as well as resident, and the waters lying easterly thereof to the sea, shall belong to the town of Seabrook for the purpose of taxation and jurisdiction, and to all other legal and constitutional interests and purposes whatever. Provided, however, that any part thereof which is now the public property of the town of South Hampton shall be exempt from taxation so long as the same shall belong to that corporation." The plaintiffs claim that this act transferred the title of the land in question from South Hampton, or the state, to the plaintiffs. If the foregoing does not constitute a legal title in the plaintiffs to the land in controversy, it is agreed that there shall be judgment for the defendant.

*Samuel W. Emery*, for the plaintiffs.

*Samuel H. Goodall* and *John S. H. Frink*, for the defendant.

CLARK, J.    The alleged trespass is upon the tract of land in controversy in *South Hampton* v. *Fowler*, 52 N. H. 225. Prior to the establishment of the boundary between the province of New Hampshire and the province of Massachusetts in 1741, this territory had been within the limits of Salisbury in the province of Massachusetts Bay; and the case finds that the beach in controversy was at that time, and for many years prior thereto had been, in the possession of the commoners or proprietors of the common lands of Salisbury. After the establishment of the boundary line substantially as it exists between the states at the present time, a

charter was granted, May 25, 1742, "at the petition of sundry
inhabitants of the land bordering on Massachusetts, granting and
confirming to the said inhabitants and their successors to be a
town or parish incorporate by the name of South Hampton,
bounded as follows: Beginning at the Atlantic ocean on the
east, at a distance three miles north of the mouth of the Merri-
mack river, and thence to run northerly to the bounds of that part
of Hampton called Hampton Falls, thence westerly to the parishes
of Kensington and Kingston, . . . including all the inhab-
itants and their estates, from said three miles north of the Merri-
mack river northerly from Mitchell's line [state line] to Hampton
Falls, . . . excepting the lands, estates, and polls of Jacob
French," and certain others named in the charter, "who are hereby
annexed to the parish of Hampton Falls;" "To have and to hold
all the privileges and immunities of a town corporate, and to be
ruled and governed in all respects for the said town affairs by the
laws of the province of New Hampshire, as other towns are." The
beach in controversy is within the boundaries of the South Hamp-
ton charter.

December 4, 1742, upon a petition of sundry of the inhabi-
tants of South Hampton, setting forth that "by reason of their
distance from the meeting-house it was difficult for them to at-
tend public worship and other affairs of the town usually trans-
acted there, and thereupon praying to be set off to the parish of
Hampton Falls to which they were nearest, which having been
considered and appearing reasonable," it was enacted by the pro-
vincial legislature that "all the inhabitants and their estates lying
to the eastward of said line [now the westerly line of Seabrook]
within the said part of South Hampton shall be annexed to Hamp-
ton Falls parish aforesaid, and are hereby determined and declared
to belong to the same to all intents and purposes whatever, ex-
cepting only with respect to the duty of repairing highways below
or to the eastward" of a line described. As the set-off from South
Hampton to Hampton Falls was of the "inhabitants and their
estates" in that part of South Hampton eastward of what is now
the westerly line of Seabrook, without other description, it did
not include the non-resident and uninhabited lands of South
Hampton lying east of that line and southerly of the part set off,
and did not extend to the Massachusetts line or to the ocean, and
did not include the beach lands.

June 3, 1768, a charter was granted by the provincial legislature
incorporating a new parish in Hampton Falls by certain bound-
aries (describing a line beginning on Kensington line and extend-
ing by sundry intermediate bounds to the mouth of Brown's river,
and being substantially the present line between Hampton Falls
and Seabrook), which is declared to be "the dividing line between
the old parish of Hampton Falls and said new parish, which con-
tains all that part of Hampton Falls which lays southerly of said

line and easterly of Kensington line, and all the polls and estates within said boundaries are hereby erected and incorporated into a new parish by the name of Seabrook." A clause in the charter permitted any person, within two months after the division was made, "to poll off" with his estate into the other parish, thus giving the inhabitants the privilege of choosing which parish they would belong to. The exercise of this privilege caused confusion afterwards in the matter of highway taxes; and in 1791 the legislature, upon petition, enacted that the inhabitants should work out or pay their highway taxes in the parish where they lived. The petition to the legislature recited that Seabrook was taken off. from Hampton Falls and made a distinct parish on account of the dissent of the people from the settlement of the Rev. Mr. Wingate as the minister of the parish of Hampton Falls, and that liberty was given to persons on either side of the division line to poll off with their estates into the other parish, "that they might have the choice as to the enjoyment of the privileges of religious worship in one parish or the other." New Hampshire Town Papers, vol. 12, p. 151.

It is apparent that Seabrook, when incorporated as a parish in 1768, was taken entirely from Hampton Falls, and included substantially the territory set off from South Hampton to Hampton Falls by the act of December 4, 1742, being separated from the ocean and from Massachusetts by the easterly portion of South Hampton. From a plan of South Hampton, filed in the office of the secretary of state under the act of December 30, 1803, requiring towns, parishes, and places to be surveyed for the purpose of obtaining a map of the state (Laws 1804, p. 207), showing among other things the extent other towns adjoined, it appears that what is now the southern portion of Seabrook was then included within the limits of South Hampton. This plan contains the following memoranda: "South Hampton joins Seabrook or runs down in or upon Seabrook 1901 rods." "South Hampton adjoins the ocean 433 rods." "South Hampton adjoins Salisbury Mass. as the line runs 3077 rods." "South Hampton taxes all the non-resident land below this double line [Seabrook west line] to the ocean but the inhabitants belong to Seabrook." 52 N. H. 226. Thus it appears, and it is agreed, that the boundaries of the parish of Seabrook, as incorporated June 3, 1768, did not include the beach in controversy.

If Seabrook has a title to the beach, it has been acquired since its charter was granted. The only mode suggested by which a title could be gained is by the act of June 26, 1822. That act confirmed and established the westerly boundary line of Seabrook, and enacted that "all the lands, non-resident as well as resident, and the waters lying easterly thereof to the sea, shall belong to the town of Seabrook for the purposes of taxation and jurisdiction and to all other legal and constitutional interests and pur-

poses whatever. *Provided,* however, that any part thereof, which is now the public property of the town of South Hampton, shall be exempt from taxation so long as the same shall belong to that corporation."

The act did not purport to transfer any title or make any grant of land. It extended the municipal franchise over the territory, but it neither divested nor conferred any title. Its operation and effect were to make all the land, non-resident as well as resident, within the limits defined, subject to the municipal authority of the town of Seabrook, the resident land being already under its jurisdiction. The mere act of incorporation of the inhabitants of a territory confers no title to the land previously granted or ungranted. But if the law was otherwise, the recognition of the claim of South Hampton to the ownership of a portion of the territory by exempting it from taxation is conclusive that the legislature did not undertake or intend to transfer any land title from South Hampton to Seabrook.

It does not appear that Seabrook ever acquired a title to the beach land in controversy.

*Judgment for the defendant.*

CARPENTER and CHASE, JJ., did not sit: the others concurred.